UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH MCDONOUGH,              )
                              )
            Plaintiff,        )
                              )
                              )   CIVIL ACTION NO.
                              )   11-11167-DPW
        v.                    )
                              )
AETNA LIFE INSURANCE COMPANY, )
HM LIFE INSURANCE COMPANY,    )
BIOGEN IDEC, INC., & BIOGEN   )
IDEC INC. GROUP LONG TERM     )
DISABILITY PLAN               )
                              )
            Defendants.       )

MEMORANDUM AND ORDER
February 18, 2014

Joseph McDonough challenges the decision of the Aetna Life Insurance Company denying his claim for continued benefits under the Biogen Idec, Inc. Group Long Term Disability Plan (the "Plan"), an ERISA employee benefit.  The parties have filed cross-motions for summary judgment.

## I.  BACKGROUND

Joseph McDonough worked at Biogen Idec, Inc. beginning in 2004.  From March 26, 2007 until November 24, 2008, Mr. McDonough held the position of Senior Systems Analyst, in which he was responsible for information technology administration.

-1-

On November 23, 2008, Mr. McDonough experienced a sudden onset of numbness of the right side of his body, accompanied by an overall loss of strength, blurred vision, and trouble speaking.[1]  He went to the emergency department at Jordan Hospital, where he was treated for a suspected stroke.  He was hospitalized for two days, but imaging tests failed to confirm that he had suffered a stroke.

Despite the lack of a formal diagnosis of stroke, Mr. McDonough's symptoms persisted.  As a result of stroke-like and other neurological symptoms that developed shortly thereafter, he was rendered unable to work.  He began receiving short term disability benefits following the onset of his symptoms, and later applied for long term disability ("LTD") benefits.  Aetna approved his application for LTD benefits on June 4, 2009, with benefits effective from May 23, 2009.  His coverage continued until Aetna denied his claim for continued LTD benefits effective October 31, 2009.

**A.   *The Long Term Disability Plan***

Mr. McDonough's LTD benefits are governed by the terms of the Biogen Idec, Inc. Group Long Term Disability Plan, in which he had chosen to participate.

---

[1] Although Mr. McDonough's affidavit states that his symptoms began on November 28, 2008, the remainder of the Administrative Record indicates that the correct date is November 23.

The Plan tells a participant like Mr. McDonough that he "will be deemed to be disabled on any day if . . . you are not able to perform the material duties of your own occupation solely because of disease or injury; and . . . your work earnings are 80% or less of your adjusted predisability earnings." The Plan further provides, in relevant part, that a participant's "period of disability ends on the first to occur of:  The date Aetna finds you are no longer disabled or the date you fail to furnish proof that you are disabled . . . [or] [t]he date an independent medical exam report or functional capacity evaluation fails to confirm your disability."

The Plan also provides that "[a] period of disability will end after 24 monthly benefits are payable if it is determined that the disability is primarily caused by: a Mental Health or Psychiatric condition, including physical manifestations of these conditions, but excluding those conditions with demonstrable, structural brain damage . . . ."

"Own occupation" is defined by the Plan as "the occupation that you are routinely performing when your period of disability begins."  The Plan further specifies that: "[y]our occupation will be viewed as it is normally performed in the national economy instead of how it is performed . . . for your specific employer; or at your location or work site; and without regard to

-3-

your specific reporting relationship."  The Plan defines "material duties" as the duties that "are normally required for the performance of your own occupation; and cannot be reasonably: omitted or modified.  However, to be at work in excess of 40 hours per week is not a material duty."

Aetna asserts that it was justified in denying Mr. McDonough's claim for continued benefits because his medical examinations indicate that he no longer meets the definition of "disabled" under the Plan.

**B.  *Clinical Examinations and Records Reviews***

In the months and years following the initial onset of his symptoms, Mr. McDonough consulted numerous medical providers seeking a cause for the symptoms he has experienced since the November 23, 2008 episode.  A total of sixteen physicians, therapists or other professionals have either examined Mr. McDonough or reviewed his medical records.  The administrative record reflects that of these sixteen professionals, eight directly considered and addressed Mr. McDonough's ability to return to work, with three opining that he is not able to return to his occupation, and five opining that he is able.  The other eight professionals commented on certain of his functional impairments, but did not directly opine on his ability to return to work.  The following is a summary of the impressions and

conclusions of the various professionals, presented in roughly chronological order.

### 1.   Dr. Mead Northrop

Mr. McDonough's primary care provider, Dr. Mead Northrop, certified Mr. McDonough's disability in conjunction with his initial claim for LTD benefits.  As summarized by Aetna in a claim summary dated June 4, 2009 (the date of the initial approval by Aetna of McDonough's LTD benefits), Dr. Northrop concluded that:

> claimant has no ability to work with [restrictions and limitations] of inability to pull, pusch [sic], and lift. Claimant also has left hip bursitis.  Medical evidence shows that he gets fatigue [sic] frequently.  Claimant at this time is unable to perform the systems analyst job, the balance issue will pose a threat to claimant.  Claimant will need to complete physical therapy to be able to fulfill the lifting requirements on his occupation as he is right handed.

Aetna's case log indicates that Dr. Northrop subsequently submitted an Attending Physician Statement on August 7, 2009, stating that Mr. McDonough had a sedentary level of functionality and could work for eight hours per day, five days per week. Following this report from Dr. Northrup, Aetna designated Mr. McDonough's continued disability claim for a vocational assessment.

### 2.  Dr. Scott Silverman

On March 26, 2009, Mr. McDonough was examined by Dr. Scott Silverman, a neurologist in the Outpatient Stroke Prevention Clinic at Massachusetts General Hospital West.  Based upon his examination, Dr. Silverman noted that Mr. McDonough exhibited "significant giveaway weakness on the upper right and lower right extremity," and "a somewhat antalgic gait."  He commented that "clinically it sounds like he had a stroke," but that it would be "unusual" for a patient to have continued "significant weakness," as Mr. McDonough reported, and not see evidence of the stroke on an MRI.  Dr. Silverman was therefore "unsure whether he in fact did have a stroke."  Dr. Silverman suggested other possible causes of Mr. McDonough's symptoms but noted that they too were unlikely.

### 3.  Dr. Donald Cutlip

Mr. McDonough was referred to a cardiologist at Beth Israel Deaconess Medical Center, Dr. Donald Cutlip, for a consult regarding shortness of breath upon exertion.  Following an August 4, 2009 appointment, Dr. Cutlip wrote to the referring physician regarding his "Impression and Plan":

> #1 Exertional dyspnea.  He has symptoms that are concerning But history is somewhat difficult to evaluate and confounded by his right sided neurologic symptoms that limit activity. Nevertheless, the limited endurance and early onset of dyspnea requires further evaluation.

. . . .

#3 ? Stroke.  This is a somewhat confusing picture.  It is
unusual for the MRI not to show some evidence, given what
appears to be a sizeable deficit.  I am also uncertain
regarding exam reliability.

Following an October 5, 2009 visit, which occurred days

before the termination by Aetna of Mr. McDonough's LTD benefits,

Dr. Cutlip noted "[s]ince his last visit a month ago he feels

about the same.  His activity remains limited due to his right

sided weakness and balance, but he still notes some shortness of

breath."  Finally, in a November 4, 2009 report, Dr. Cutlip

concluded:

> As you know, the stress echo was indeed negative and the
> neurology evaluation concluded his findings were not related
> to stroke and were consistent with reaction to severe work
> stress.  At the time of my evaluation, it was not known to
> me that the stress related to his job had become
> increasingly intense for about 2 1/2 to 3 years, and clearly
> reached a crisis prior to the onset of his symptoms.  The
> manifestations of this are most clear in the neurologic
> syndrome.  I am not treating Mr. McDonough for these
> neurologic symptoms and I am not a qualified expert to judge
> their cause, so will defer to Drs. Caplan and Duffis in this
> regard.

### 4.   Dr. Ennis Jesus Duffis and Dr. Louis Caplan

Dr. Cutlip referred Mr. McDonough to Dr. Ennis Jesus Duffis

and Dr. Louis Caplan, both of whom are neurologists at Beth

Israel.  Following an August 18, 2009 visit, both doctors

observed that Mr. McDonough "has full strength, proximally and

distally, in his upper and lower extremity on the left side; on

-7-

the right side he has effort-dependent weakness in all muscle groups proximally and distally." As to their "impression and recommendation," the doctors commented that they "reassured Mr. McDonough as to the benign findings on his exam and on his initial MRI and counseled him to avoid overly exerting himself as this seems to contribute to worsening of his symptoms." Dr. Caplan noted in an August 25 addendum that:

> [j]ust before the onset of symptoms he told us he was working almost constantly without a break. [H]e had a previous problem diagnosed as a post-traumatic stress condition and had seen a psychiatrist. His present exam reveals only give-way weakness. I believe that the symptoms are a complex reaction to his stressful work situation. [H]e cannot say no to excessive work and the present symptoms allow him to back off the responsibilities.

Following a September 15, 2009 visit, Drs. Ennis and Caplan commented that Mr. McDonough:

> presents with recurrent episodes of weakness and numbness of the right side, which are likely related to his prior diagnosis of anxiety and posttraumatic stress. This appears to be related to his stressful job situation. We would agree that pharmacotherapy as warranted for his anxiety will be beneficial along with continued physical therapy. We have reassured Mr. McDonough again today as to the benign nature of the findings on exam and on imaging.

In an addendum to the September 15 report, dated September 24, 2009, Dr. Caplan commented:

> I reviewed the interim history with [M]r. McDonough and Dr. Duffis, reexamined him, and reviewed the available imaging. His gait does not reflect an organic disorder of his nervous system and he has no convincing abnormalities of his neurological examination except give-way weakness. [H]is

imaging is also normal.  We have attempted to reassure him
but unsuccessfully.  [W]e spent 20 minutes of a 40 minute
visit counceling [sic] him about his condition and trying to
explain how the mind controls the functions of the nervous
system.

5.  <u>Mary Callahan</u>

Mr. McDonough began therapy sessions with Mary Callahan,
LICSW on June 10, 2009, for the treatment of anxiety, panic
attacks, and difficulty concentrating.  In her treatment plan,
she noted that Mr. McDonough's goals were to "reduce overall
level, frequency and intensity of anxiety so that daily
functioning is not impaired."

On October 5, 2010, Ms. Callahan submitted to Aetna a
summary of her diagnosis and clinical observations from November
1, 2009 to the date of the letter.  Ms. Callahan summarized her
observations as follows:

> In sessions I have observed Mr. McDonough having panic
> attacks (racing hear [sic], difficulty breathing) when
> talking about past work experiences and startle response
> when the phone rang.  Mr. McDonough's functioning has been
> impacted in terms of increased anxiety, particularly in
> public places, in maintaining social relationships, in
> concentrating and focusing to get daily tasks accomplished.
> He at times has a noticeable visible limp and is in pain
> with restricted movement.
>
> . . . He has been cooperative [with treatment] but the
> intensity and severity of the symptoms have impeded any
> significant progress.  He continues to be triggered by work
> memories, nightmares and flashbacks.  Due to the above, I do

not believe that Mr. McDonough could perform the functions of his occupation on a full time basis at this time.[2]

### 6.  Dr. Allan F. Giesen

Also on June 10, 2009, Mr. McDonough began seeing Ms. Callahan's colleague, Dr. Allan F. Giesen, D.O., for monthly medication management.  In a Mental Impairment Questionnaire submitted to Aetna on June 18, 2010, Dr. Giesen indicated that Mr. McDonough suffers from post-traumatic stress disorder and panic disorder, with clinical findings including "some difficulty with memory at times, some irritability, significant panic attacks related to work trauma."  Dr. Giesen indicated that he was "unable to assess" Mr. McDonough's ability to do "work-related activities on a day-to-day basis in a regular work setting," and did not respond to a series of questions aimed at evaluating this ability.  However, Dr. Giesen did indicate that he anticipated Mr. McDonough's condition would cause him to miss more than four days of work per month, on average.  Dr. Giesen did not provide a response to the question "[i]s your patient a malingerer?"  Dr. Giesen opined that Mr. McDonough's prognosis was "fair to good."

---

[2] I note that the first and second pages of Ms. Callahan's letter are transposed in the Administrative Record.

7.   Dr. Jay Stearns

Mr. McDonough consulted with another colleague of Ms. Callahan, psychiatrist Dr. Jay Stearns, on October 9, 2009.  Dr. Stearns diagnosed him with generalized anxiety disorder with depressive features.  Following that visit, Dr. Stearns reported on a behavioral health clinician form submitted to Aetna that Mr. McDonough experienced "sleep disturbance, heart palpitations, sweating, racing thoughts, fear of death," and experienced panic attacks 4-5 times per week with an average duration of two hours. Dr. Stearns opined that as a result of his mental health status, Mr. McDonough was unable to work and projected that he would be able to return to work by October of 2010.

At a November 6, 2009 follow-up visit, Dr. Stearns increased Mr. McDonough's dosage of the antidepressant Celexa, noting that he reported difficulty sleeping, anxiety and panic attacks.  In his note from a December 4, 2009 visit, Dr. Stearns noted that Mr. McDonough reported suffering a panic attack in the waiting room prior to his appointment, that he was continuing to have trouble sleeping, and that he was "reliving Biogen."

Later, in response to an inquiry from Mr. McDonough's then-counsel, Dr. Stearns opined in a January 29, 2010 letter that "from a psychiatric standpoint, I do not feel Mr. McDonough is currently able to work due to his generalized anxiety and

depression," further stating that "I am unable to provide an opinion regarding his neurological condition."

8.  Catherine Sullivan - Physical Therapy

Mr. McDonough completed a second round of physical therapy, consisting of twelve sessions between April 1 and April 30, 2010.[3] His physical therapist, Catherine Sullivan, MSPT, made a detailed note following his first and final sessions documenting his subjectively and objectively measured symptoms and goals of therapy.  Following the first session, Ms. Sullivan noted that Mr. McDonough reported a constant level of hip pain of 4-5/10, with occasional spikes to 8/10.  She noted based on her observation that Mr. McDonough displayed "decreased weight bearing right leg in standing, antalgic gait with increased BOS and circumduction of B legs."  She observed that Mr. McDonough was "very unsteady and unable to maintain static stance without grabbing onto the wall."  Although it is unclear whether based on her own observation or reporting by Mr. McDonough, Ms. Sullivan noted that Mr. McDonough was not able to walk for more than fifteen to twenty minutes, not able to stand for more than five minutes, had difficulty climbing stairs, and could not lift or carry anything.

_____

[3] Mr. McDonough completed an initial round of physical therapy in late 2008, however records from this period are not included in the Administrative Record.

As of their final session, Mr. McDonough reported that although his symptoms persisted, his mobility had improved and he had resumed light exercises at the gym.  Ms. Sullivan noted that Mr. McDonough "continues to present with severe hip pain and tightness left lateral hip which has not improved with therapy," and that although "[h]e has made some gains in left hip flexibility . . . there has been no improvement in left hip pain or function."  She concluded by remarking: "[a]t this time he has reached max benefit from therapy and should continue independently with home ex for stretching and strengthening."

9.  Gail Breeze - Functional Capacity Evaluation

On June 15, 2010, Mr. McDonough submitted to a Functional Capacity Evaluation ("FCE") at Spaulding Rehabilitation Hospital. The two-hour FCE was designed to determine "his current capacity and appropriateness for a Work Hardening Program" by evaluating his "demonstrated physical abilities regarding essential job functions/work capacities."  The evaluator, occupational therapist Gail Breeze, noted Mr. McDonough had significant difficulty with all of the following: maintaining his balance, climbing stairs, lifting and carrying objects, bending over, and writing and typing.  After completing the physical tests, Mr. McDonough reported a pain level of 8.5/10.  Ms. Breeze summarized her findings and recommendations as follows:

Currently performing in a sedentary level of physical demand with regard to load handling.  Decreased endurance for the work day.  Decreased body mechanics for load handling. Demonstrated limited tolerance to work postures/movements (e.g., squatting, kneeling, dynamic standing, climbing). Demonstrated decreased flexibility of his trunk and left lower extremities.  Adequate ROM of his upper extremities. Decreased strength of trunk, left lower extremity muscles. Appeared to give full effort as demonstrated by BTE consistency of effort testing.[4]

10.  Dr. Joseph Frank Zabilski

On June 16, 2010, Mr. McDonough sought treatment from an orthopedist, Dr. Joseph Zabilski, complaining of left hip pain. Dr. Zabilski noted that "[e]xamination of the left hip shows pain with range of motion of the left hip though there does appear to be full range of motion without crepitus."  He specifically noted that Mr. McDonough reported pain on rotation and on resisted hip abduction.  He ordered an MRI scan of the left hip due to the persistent pain, and commented that "if the scan is negative for significant hip trochanteric abnormality I am concerned this may be a pain syndrome type of situation and will consider referring to a pain clinic for possibility of looking for referred pain syndrome from elsewhere."

---

[4] Although Ms. Breeze's concluding remarks indicate that Mr. McDonough "[a]ppeared to give full effort as demonstrated by BTE consistency of effort testing," certain other measures of consistency of effort appear to "suggest sub-maximal effort was present" with regard to grip and pinch strength.

At a follow-up visit on August 18, 2010, Dr. Zabilski again noted that Mr. McDonough reported hip pain and tenderness on palpation.  Because the earlier hip MRI was negative, Dr. Zabilski ordered an MRI scan of the "LS spine as this would be the next most likely place for referred pain pattern and he does have some signs on physical exam and possible nerve irritation."

### 11.  James T. Parker

Counsel for Mr. McDonough engaged James Parker, an independent vocational consultant who performs evaluations for insurers and plaintiffs' and defense attorneys, to conduct a review of Mr. McDonough's medical records for the purpose of evaluating his ability to perform the duties of his own occupation.  Upon reviewing the records, including evaluations conducted by Aetna prior to its initial termination of Mr. McDonough's benefits, Mr. Parker rendered the following opinion in a report dated July 22, 2010:

> It is this consultant's vocational opinion that Aetna Insurance Company has not acknowledged the exertional and non-exertional impairments and functional limitations established by Mr. McDonough's treating physicians and therapists that prevent him from performing duties essential to his Own Occupation or in any occupation for which he could qualify by education training, and experience.
>
> The medical record establishes that Mr. McDonough experiences weakness and numbness on his right side that result in difficulties in balance and sudden falls without warning.  The likelihood of Mr. McDonough experiencing sudden falls at work due to impaired balance precludes him

from performing the standing and walking required for even *sedentary* occupations.  By definition, *sedentary* work may require standing and walking for up to two hours a day.  Mr. McDonough's likelihood of falling would present a danger to himself or other employees.

Although Mr. McDonough's occupation is defined as *sedentary*, considerable travel by plane was necessary in resolving project issues and coordinating client services.  The degree of walking required while in airports or in training of staff and customers would at times make this occupation *light* in terms of standing and walking. . . .

. . . .

Mr. McDonough experiences right-sided numbness that affects his ability to perform fine motor tasks with his right hand and arm.  This impairs his ability to perform the control precision, arm/hand steadiness, and manual and finger dexterity defined as important descriptors of required physical tasks necessary to perform essential job duties.

. . . Furthermore, being absent from work more than four times a month [as Dr. Giesen anticipated] would more likely than not lead to termination from any occupation for which Mr. McDonough would qualify by education, training, and experience.

In conclusion, Mr. Parker stated the following:

Mr. McDonough has an excellent work history in positions of substantial responsibility in which he experienced occupational success over an extended period of time.  Mr. McDonough's success is indicative of his motivation to succeed in a highly demanding and highly skilled occupation. Based on the limitations established by Mr. McDonough's physicians and practitioners, he is totally disabled from all employment.  It is this consultant's vocational opinion that more likely than not within a reasonable degree of vocational rehabilitation certainty Mr. McDonough is totally disabled from all work for which he could reasonably qualify by education, training, and experience and will remain so for the foreseeable future.

12.  Dr. Robert Swotinsky

On September 17, 2010, in response to Mr. McDonough's appeal from the denial of continued LTD benefits, Aetna physician Dr. Robert Swotinsky reviewed Mr. McDonough's medical records for evidence of functional impairment after November 1, 2009.  As to Mr. McDonough's "claimed right-sided weakness and difficulty walking," Dr. Swotinsky noted that "[e]xtensive testing has failed to identify a reason" for those symptoms, and "[t]he possibility remains, as expressed by some of his personal physicians as well, that there is no injury, illness, or other physical reason for this claim to disability."  Because he concluded that the medical records definitively demonstrated that Mr. McDonough did not have a stroke, Dr. Swotinsky focused his review on whether Mr. McDonough "has impairment – in this case, from an affective [psychiatric] disorder – that disables him from employment as a systems administrator."

Reasoning that because Mr. McDonough's "is a sedentary job; there are no jobs with easier physical demands," Dr. Swotinsky stated "[i]f Mr. McDonough is disabled from this kind of work, then he is completely disabled.  So the question is essentially whether or not Mr. McDonough is completely disabled."  Relying on the Social Security Administration's criteria for establishing complete disability as a result of an affective disorder, Dr.

-17-

Swotinsky concluded that Mr. McDonough's symptoms of anxiety and depression were not severe enough to cause him to be disabled. Based on "normative date" projections for these disorders, he concluded that Mr. McDonough had been out of work far too long. Dr. Swotinsky noted that if further testing (such as psychometric testing of Mr. McDonough's mental capabilities) demonstrated Mr. McDonough to have "sufficient organic brain damage, he may be disabled on that basis."

With respect to prior evaluations of Mr. McDonough by various specialists, Dr. Swotinsky specifically remarked that he essentially did not consider reports produced by consultants, such as Mr. Parker, whom "Mr. McDonough's attorneys have sent him to . . . for reports that will help support his disability claim." [AR 315].  Dr. Swotinsky noted his agreement with Mr. McDonough's primary care provider, Dr. Northrup, who "cleared him to return to his job," and explicitly disagreed with Dr. Stearns' judgment that Mr. McDonough could not return to his job due to anxiety and depression, noting that Dr. Stearns rendered this opinion in response to an inquiry from Mr. McDonough's attorney.

### 13.  Dr. Lawrence Burstein

Also on September 17, 2010, Aetna psychologist Dr. Lawrence Burstein completed a review of Mr. McDonough's medical records in conjunction with Mr. McDonough's appeal.  Although Dr. Burstein

addressed each record from the applicable period in turn, he
criticized nearly every such record as lacking specific findings
regarding task-specific occupational impairments resulting from
Mr. McDonough's psychological condition.  He rejected Mr.
Parker's conclusion that Mr. McDonough is "totally disabled from
all employment" as unsupported by the records.  He indicated that
he attempted to speak with Dr. Stearns and Ms. Callahan but was
unable.  He ended his review by commenting that "[t]he few
references available regarding the claimant's mental status were
within normal limits," and concluded, "[t]herefore, there are no
findings to support that the claimant had a specific impairment
or impairments in his psychological functioning likely to have
prevented him from performing any particular task or tasks of his
occupational functioning during the period under review."

    14.  <u>Dr. Aparna Dixit</u>

    On November 2, 2010, Psychologist Aparna Dixit completed a
review for Aetna of Mr. McDonough's medical records as part of
the appeal process.  Based upon her review, she concluded that
the "records do not indicate that his anxiety/posttraumatic
stress disorder (which is reportedly due to work related stress)
has caused a psychological impairment that is significant enough
to prevent him from carrying on work related activities."

### 15.  Dr. Joseph Rea

On November 2, 2010, Dr. Joseph Rea completed a review for Aetna of Mr. McDonough's medical records as part of the appeal process.  Dr. Rea, who is board certified in occupational medicine, focused his review on Mr. McDonough's physical limitations and the degree to which they would impair his ability to perform his own occupation.  Dr. Rea noted that "it appears there is a physical functional impairment due to left trochanteric bursitis," but as to this particular condition, concluded that "the claimant's functional deficits would not preclude him from working in his own sedentary level occupation."  With respect to weakness and numbness of the extremities, Dr. Rea concluded that these symptoms are "not clearly physically based," and that the totality of Mr. McDonough's medical history from the relevant period suggests the symptoms may be psychological in nature.  Based upon his review of Mr. McDonough's records, Dr. Rea suggested the following restrictions and limitations:

    1).  May work at a sedentary physical demand level.
    2).  No climbing, crawling, crouching, kneeling, or bending.
    3).  May walk or stand for 10-minute periods, alternating with 30-minutes of sitting.  May walk/stand either separately or in combination up to four hours per day over an eight hour period.
    5).[5] There is no restriction on reaching.

---

[5] Dr. Rea skipped the number four in his list of restrictions and limitations.

6).   Any handling or fingering work with the right hand
should be limited to five-minute periods, alternating with
10-minute periods of right hand rest.
7).   Consistent with a sedentary physical demand level, he
can sit unrestricted.

## C.  *Procedural History*

By letter dated June 4, 2009, Aetna approved Mr. McDonough's

claim for LTD benefits effective May 23, 2009.[6]  From Aetna's

case log, the initial approval attributes his disability to "CVA

[stroke] with symptoms of numbness, weakness of the right arm and

leg," and bases the finding of disability primarily on Dr.

Northrup's initial opinion that due to the physical effects of

the then-suspected stroke, Mr. McDonough was unable to "pull,

pusch [sic], and lift[,] . . . gets fatigue[d] frequently," and

had a "balance issue," and as a result was unable to perform his

job as a systems analyst.  The letter approving Mr. McDonough's

claim notified him that Aetna would periodically request updated

information from his attending physician to certify that he

remained disabled as defined by the Plan.

On or about September 3, 2009, Aetna received from Dr.

Northrop an Attending Physician Statement dated August 7, 2009,

indicating that Mr. McDonough has a "sedentary level of

functionality," and "could work 5 days a week and 8 hours per

---

[6] The Plan provides that LTD benefits become payable following a
180 day elimination period from the date of disability.

day." Believing he no longer met the definition of disabled under the Plan, Aetna designated Mr. McDonough's file for a vocational assessment.

On September 14, 2009, Mr. McDonough informed Aetna that he had been referred to Mary Callahan and Dr. Stearns for a psychiatric evaluation. As part of its review of Mr. McDonough's claim for continued benefits, Aetna reviewed his psychiatric records from the period in question.

Aetna terminated Mr. McDonough's LTD benefits by a letter dated October 29, 2009, with the termination effective October 31, 2009. The stated basis for the termination was the September 3, 2009 Attending Physician Statement from Dr. Northrup stating that Mr. McDonough could return to sedentary work for up to forty hours per week, as well as a review of Mr. McDonough's psychiatric records which did not in Aetna's view support a finding of disability after September 30, 2009.[7]

Represented by counsel, by a letter dated April 21, 2010, Mr. McDonough appealed Aetna's decision terminating his LTD benefits. In support of his appeal, Mr. McDonough submitted

---

[7] As reflected in the termination letter, Aetna also based its decision in part on a misreading of Dr. Stearns' October 2009 behavioral health clinician statement. Aetna read the statement to indicate that Dr. Stearns projected Mr. McDonough to return to work by October 9, 2009, when the correct date was actually October 9, 2010.

additional medical records, as well as the results of the

functional capacity evaluation performed by Gail Breeze and the

vocational assessment performed by James Parker.  After

submitting Mr. McDonough's file for review by Drs. Swotinsky,

Burstein, Dixit and Rea, Aetna upheld its original decision by

letter dated November 17, 2010.  Mr. McDonough thereafter filed

his complaint with this court on June 30, 2011.

## II.   STANDARD OF REVIEW

As I have recently observed, "[s]ummary judgment in the

ERISA context differs significantly from summary judgment in an

ordinary civil case."  *Petrone* v. *Long Term Disability Income*

*Plan for Choices Eligible Employees of Johnson & Johnson and*

*Affiliated Cos.*, 935 F. Supp. 2d 278, 287 (D. Mass. 2013).  The

usual factual inferences in favor of the non-moving party do not

apply,[8] and "in a very real sense, the district court sits more

---

[8]  As I noted in *Petrone*, "[t]he First Circuit has not been
entirely consistent in its articulation of this point of law."
*Petrone*, 935 F. Supp. 2d at 287 n.1; *Compare Gent* v. *CUNA Mut.*
*Ins. Society*, 611 F.3d 79, 82–83 (1st Cir. 2010) ("[W]e typically
view the record evidence in the light most favorable to the non-
moving party. . . . Our approach is different, however, in the
ERISA benefit denial context. . . ." (citations omitted)) *and*
*Orndorf* v. *Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir.
2005) ("[T]he non-moving party is not entitled to the usual
inferences in its favor.") *with Wright* v. *R.R. Donnelley & Sons*
*Co. Grp. Benefits Plan*, 402 F.3d 67, 74 (1st Cir. 2005) ("The
operative inquiry . . . is whether the aggregate evidence, viewed
in the light most favorable to the non-moving party, could
support a rational determination that the plan administrator

as an appellate tribunal than as a trial court.  It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Leahy* v. *Raytheon Co.*, 315 F.3d 11, 17–18 (1st Cir. 2002).

Under Supreme Court precedent, "a denial of benefits challenged under [29 U.S.C] § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co.* v. *Bruch*, 489 U.S. 101, 115 (1989). It is equally well-established, however, that if "the ERISA plan grants the plan administrator discretionary authority in the determination of eligibility for benefits, the administrator's decision must be upheld unless it is arbitrary, capricious, or an abuse of discretion." *Wright* v. *R.R. Donnelley & Sons Co. Grp. Benefits Plan*, 402 F.3d 67, 74 (1st Cir. 2005) (internal citation and quotation omitted).  Applying the abuse of discretion standard – sometimes characterized as (and equivalent to) the 'arbitrary and capricious' standard — the question this court must answer is "whether a plan administrator's determination 'is

_____

acted arbitrarily in denying the claim for benefits." (quotations omitted)).

plausible in light of the record as a whole, or, put another way, whether the decision is supported by substantial evidence in the record.'" *Colby* v. *Union Sec. Ins. Co.*, 705 F.3d 58, 61 (1st Cir. 2013) (quoting *Leahy* v. *Raytheon Co.*, 315 F. 3d 11, 117 (1st. Cir. 2002)).

## A.   *Reservation of Discretion*

Although Mr. McDonough acknowledges that the Plan contains language reserving discretionary authority to Aetna,[9] he argues that Aetna should bear the burden of supporting its position under the less deferential *de novo* standard of review because Aetna first disclosed the plan document containing the grant of discretionary authority on February 4, 2013, well after Mr. McDonough initiated this lawsuit.  Prior to that date, in response to repeated requests for "a complete copy of Mr. McDonough's plan, summary plan description, policy, and any and all attachments and amendments relating to his Long Term Disability Plan" during the internal appeals process, Aetna had provided Mr. McDonough with two documents, which Aetna refers to as the "Summary of Coverage" and the "Booklet," both of which summarize the key points of the Plan but do not contain a

---

[9] The Plan provides Aetna with "discretionary authority to: determine whether and to what extent employees and beneficiaries are entitled to benefits; and construe any disputed or doubtful terms of this policy."

reservation of discretionary authority.  The only plan document containing the reservation of discretionary authority is the belatedly-produced "Group Contract" between Aetna and Biogen, which is referenced in both the Summary of Coverage and the Booklet.

Mr. McDonough relies principally on the Seventh Circuit's decision in *Herzberger* v. *Standard Ins. Co.*, 205 F.3d 327 (7th Cir. 2000), to assert that he must have received actual notice of Aetna's reservation of discretion before Aetna's denial of benefits is entitled to deferential review.  Relying for its part principally on a recent case from the Second Circuit, *Thurber* v. *Aetna Life Ins. Co.*, 712 F.3d 654 (2d Cir. 2013), Aetna counters that its belated disclosure of the Group Contract containing the grant of discretionary authority does not compel application of *de novo* review.

Like Mr. McDonough, the plaintiff in *Thurber* relied on *Herzberger* to argue that a participant or beneficiary must have received actual notice of a reservation of discretionary authority in order for the abuse of discretion standard to apply in a court challenge.  *See Thurber*, 712 F.3d at 659.  In *Herzberger*, the Seventh Circuit reversed and remanded two district court decisions granting summary judgment to plan administrators upon application of the abuse of discretion

standard, because it concluded that neither plan at issue
contained language clearly reserving discretion to the respective
plan administrators.  *See* 205 F.3d at 333.  In so holding, the
Seventh Circuit noted that "[t]he employees are entitled to know
what they're getting into, and so if the employer is going to
reserve a broad, unchanneled discretion to deny claims, the
employees should be told about this, and told clearly."  *Id.*

In rejecting the *Thurber* plaintiff's reliance on *Herzberger*,
the Second Circuit accurately observed that *Herzberger* "did not
in any way involve, and the court's language did not address, a
situation in which the plan's language *did* unambiguously provide
for discretion . . . , but the employee seeking benefits had not
received a copy [of the document reserving discretion]."
*Thurber*, 712 F.3d at 659.  Further, to the extent that *Herzberger*
might be read as imposing an actual notice requirement on an
insurer's reservation of discretion, the Second Circuit rejected
that imposition as lacking "any basis in law or the statute
[i.e., ERISA]," where ERISA does not require that a reservation
or grant of discretion be included in a summary plan description
and "an administrator of an ERISA plan has no obligation to
ensure that participants receive copies of the plan itself."  *See*
*Thurber*, 712 F.3d at 659 (citing 29 U.S.C. § 1022(b) and 29

C.F.R. § 2520.102-3 (setting forth requirements for disclosure of summary plan descriptions)).[10]

I agree with the Second Circuit's conclusion in *Thurber* that the court in *Herzberger* was not concerned with the question whether the insurers gave *notice* of a reservation of discretion, but whether the plans at issue featured such a reservation at all.  *See Thurber*, 712 F.3d at 659; *Herzberger*, 205 F.3d at 329, 331.  Moreover, as the *Thurber* court recognized, from a practical standpoint, the fact that a beneficiary lacks actual notice of an insurer's reservation of discretion "is of no consequence" because such a provision "is effectively addressed not to the beneficiary, but only to a reviewing court that must act only after an application has been denied."[11]  *Id.* at 660.  For this reason, the argument in favor of an actual notice requirement lacks the persuasive value it might have if the provision at issue affected the beneficiary's substantive rights under the

---

[10] Whether an administrator has a duty to provide a copy of the plan itself *upon request* by a participant, and whether there is a penalty for failure to do so, is a different matter.  *See infra* Part III.B.1.

[11] While I agree with the Second Circuit that a reservation of discretion is principally directed at a reviewing court, and therefore the prejudicial effect of the belated or non-disclosure of such a provision is limited, I disagree that it "is of no consequence."  As one might imagine, whether a particular plan contains a discretionary reservation may well impact, among other things, a claimant's ability to find counsel willing to take his case.  *See infra* Part III.B.1.

plan.  *See id at* 659-60.  Accordingly, despite Aetna's belated
disclosure to Mr. McDonough of the Group Contract containing the
language reserving discretionary authority, I decline to impose
*de novo* review where the plan unequivocally makes such a
reservation.

### B.  *Conflict of Interest*

Even in an ERISA benefit denial case where the abuse of
discretion standard applies, the evaluative approach can increase
in intensity when there is a potential for conflict of interest.
In *Metropolitan Life Ins. Co.* v. *Glenn*, the Supreme Court held
that when a "plan administrator both evaluates claims for
benefits and pays benefits claims[, this] creates the kind of
'conflict of interest'" courts must factor in to their analysis.
554 U.S. 105, 112, 115 (2008); *see also Colby*, 705 F.3d at 62
("In some cases, an inherent conflict of interest exists; that
is, the plan administrator [typically, an insurer] not only
evaluates claims but also underwrites the plan.").  Aetna
concedes that because in this case it is both the insurer of the
LTD benefits at issue and the administrator charged with
evaluating claims, a structural conflict exists.

However, the presence of a structural conflict does not
alter the standard of review itself.  *Conkright* v. *Frommert*, 559
U.S. 506, 512 (2010) ("A deferential standard of review remains

-29-

appropriate even in the face of a conflict."); *Colby,* 705 F.3d at
62.  Instead, the court must "[t]emper the abuse of discretion
standard with skepticism 'commensurate' with the conflict," *Nolan*
v. *Heald College*, 551 F.3d 1148, 1153 (9th Cir. 2009), "tak[ing]
account of [that conflict] as a factor in determining the
ultimate adequacy of the record's support for the [insurer's] own
factual conclusion."  *See Glenn,* 554 U.S. at 119.  A conflict is
"more important . . . where circumstances suggest a higher
likelihood that it affected the benefits decision."  *Id.* at 117.
On the other hand, the conflict "prove[s] less important (perhaps
to the vanishing point) where the administrator has taken active
steps to reduce potential bias and to promote accuracy."  *Id.*  In
considering the effect of such a conflict, a court should
consider "among other factors, . . . the thoroughness and
consistency of the explanation of the denial; the care with which
the claimant's own physician's opinions were treated; and if the
administrator relied on the opinion of independent experts, the
extent to which these experts were in fact truly independent."
*See McGahey* v. *Harvard Univ. Flexible Benefits Plan*, 2009 WL
799464 at *2 (D. Mass. March 25, 2009) (citing *Glenn*, 554 U.S. at
118).

Early in this case, Mr. McDonough filed a motion seeking
discovery regarding the nature of Aetna's relationships with Drs.

Dixit and Rea, whom Aetna had held out as independent, outside reviewers, but whose reports appeared on Aetna letterhead.[12] Aetna opposed the motion, but — essentially taking the position that the presence of a structural conflict in no way tainted the internal review process — agreed that for the sake of avoiding unnecessary discovery into the matter, the court could treat Drs. Dixit and Rea identically to Drs. Swotinsky and Burstein, as if all four were Aetna-employed physicians.  With that caveat, I denied Mr. McDonough's motion for discovery.

Now on summary judgment, Aetna again attempts to characterize Drs. Dixit and Rea as "independent" reviewers despite acknowledging the substance of my earlier ruling. Although I ultimately conclude that Aetna did not abuse its discretion in relying on internal medical reviews, Aetna's position that Drs. Dixit and Rea are "independent" is in direct contradiction to its concession at the earlier hearing.  As I indicated I would, I have treated Drs. Dixit and Rea as if they were employed by Aetna.

### III.  DISCUSSION

#### A.  *Reasonableness of Aetna's Decision Terminating Benefits*

It is axiomatic that in review for abuse of discretion, "a court is not to substitute its judgment for that of the [decision

---

[12] Drs. Swotinsky and Burstein are Aetna employees.

maker]." *Motor Vehicle Mfgrs. Ass'n Vehicle Mfgrs. Ass'n of U.S., Inc.* v. *State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983); *see also Terry* v. *Bayer Corp.*, 145 F.3d 28, 40 (1st Cir. 1998) (adopting the *State Farm* rule in the ERISA benefit context). Accordingly, Aetna's final determination must be upheld as long as it is "reasoned and supported by substantial evidence in the record." *Vlass* v. *Raytheon Employees Disability Trust*, 244 F.3d 27, 30 (1st Cir, 2001); *see also Morales-Alejandro* v. *Medical Card Sys., Inc.*, 486 F.3d 693, 698 (1st Cir. 2007) (administrator's decision "must be upheld if there is any reasonable basis for it").

Aetna's final determination affirming its decision to discontinue LTD benefits, which Mr. McDonough challenges in this litigation, states that there existed "a lack of clinical findings . . . to support Mr. McDonough's inability to perform the material duties of his own occupation." Specifically, Aetna cited an absence or insufficiency of "documentation showing neurologic or muscular dysfunction[,] abnormal diagnostic test results, formal mental status examination findings, performance based tests of psychological functioning with standardized test scores, [and] behavioral observations with frequency, duration, and intensity of symptoms observed, etc." supporting his claim of disability.

In this appeal, Mr. McDonough contends that Aetna abused its
discretion in affirming the termination of his benefits by
relying on medical and vocational reviews that were fundamentally
flawed for two reasons:  first, they focused on a lack of a
definitive diagnosis and whether his conditions (as opposed to
his symptoms and functional limitations) rendered him disabled,
and, second, they assessed whether those conditions, rather than
symptoms or functional limitations, would prevent him from
performing the generic duties of a sedentary occupation, rather
than the duties of his own occupation as is required by the Plan
terms.  Upon searching review of the administrative record, I
conclude that Aetna did not abuse its discretion in either
respect.

### 1.  Physical Symptoms and Limitations

The thrust of Mr. McDonough's argument regarding his
physical symptoms is that Aetna abused its discretion by
improperly focusing its review on his lack of a definitive
diagnosis while ignoring his symptoms and functional limitations,
which he contends have remained relatively unchanged since the
November 24, 2008 stroke-like episode.  In Mr. McDonough's view,
the only thing that changed between Aetna's initial approval of
LTD benefits on June 4, 2009 and its discontinuation of those
benefits on October 31, 2009 is that his doctors ruled out stroke

as the cause of his condition.   Therefore, he argues, Aetna must have premised its subsequent denial of continued benefits on this lack of formal diagnosis.

Citing *Cook* v. *Liberty Life Assur. Co. of Boston*, 320 F.3d 11, 21 (1st Cir. 2003), Mr. McDonough argues that Aetna abused its discretion by focusing on the lack of objective evidence supporting a formal diagnosis of stroke.   In *Cook*, the First Circuit held that it was unreasonable for an administrator to require "clinical objective" evidence that the claimant was suffering from Chronic Fatigue Syndrome (CFS) where the medical evidence supported a diagnosis of CFS according to recognized diagnostic criteria, and where "there are no specific laboratory findings that are widely accepted [in the medical community] as being associated with CFS."   *Id.* (citing *Vega* v. *Comm. of Social Security*, 265 F.3d 1214, 1219 (11th Cir. 2001); *see also Mitchell* v. *Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir. 1997) ("[I]t would defeat the legitimate expectations of participants in the [] Plan to require those with CFS to make a showing of clinical evidence of such etiology as a condition of eligibility for LTD benefits.").   The First Circuit has similarly reasoned that because complaints of pain "may not be readily susceptible to objective confirmation, findings of chronic pain may not automatically be dismissed by a benefits administrator for lack

of confirmable symptoms." *Gross* v. *Sun Life Assur. Co. of Canada*, 734 F.3d 1, 22 (1st Cir. 2013); *see also Maher* v. *Mass. Gen. Hosp. Long Term Disability Plan*, 665 F.3d 289, 304 (1st Cir. 2011) (Lipez, J., dissenting) ("Our court has emphasized before that in dealing with hard-to-diagnose, pain-related conditions, it is not reasonable to expect or require objective evidence supporting the beneficiary's claimed diagnosis."); *Cusson* v. *Liberty Life Assurance Co. of Bos.*, 592 F.3d 215, 227 (1st Cir. 2010) (recognizing that "fibromyalgia is a disease that is diagnosed primarily based on a patient's self-reported pain symptoms").

Where a claim of disability is premised on a nebulous, difficult-to-diagnose condition, the court's "focus instead must be on whether evidence supports an inability to work due to 'the physical limitations imposed by the symptoms of such illnesses . . . .'" *Maher*, 665 F.3d at 304 (Lipez, J., dissenting) (quoting *Boardman* v. *Prudential Ins. Co. of Am.,* 337 F.3d 9, 16 n.5 (1st Cir. 2003). Aetna has focused its inquiry in that manner here. Contrary to Mr. McDonough's contention, neither Aetna's medical reviews nor its final determination letter indicates that any *undue* emphasis was placed on Mr. McDonough's lack of diagnosis of stroke, apart from recognizing that his symptoms are clearly *not*

attributable to a stroke, which is a readily-diagnosable event.[13]
Rather, based on what appears to be a comprehensive review of the
administrative record, Aetna focused on the lack of objective or
clinical findings supporting Mr. McDonough's claimed inability to
work as a result of his condition.

More to the point, the administrative record contains
substantial evidence that Mr. McDonough does not meet the Plan's
definition of "disabled" as a result of any physical limitations
stemming from his stroke-like episode.  Critically, the
administrative record indicates that Mr. McDonough's own primary
care provider, Dr. Northrup, cleared Mr. McDonough to return to
work at a sedentary level for up to eight hours per day, five
days per week as of August 7, 2009.  Although a copy of Dr.
Northrup's statement unfortunately does not appear in the
administrative record in its original form but only as a data
entry in Aetna's case log, Mr. McDonough does not appear to
contest the validity or accuracy of this statement.

---

[13] The administrative record in this case demonstrates that,
unlike CFS or fibromyalgia, for example, the occurrence of a
stroke is regularly confirmed through the use of diagnostic
testing.  Therefore, insofar as Mr. McDonough believed or
continues to believe that his symptoms are the result of some
undiagnosed cardiovascular event despite a wealth of evidence to
the contrary, it was not unreasonable for Aetna's medical
reviewers to consider in their evaluations the absence of
clinical evidence of stroke.

Apart from Dr. Northrup's statement supporting Mr. McDonough's initial claim of physical disability before August 7, 2009 — which is not directly pertinent to this appeal because it preceded the period under review — the remainder of the evidence of physical disability contained in the administrative record is equivocal at best.  Of the various individuals who either examined Mr. McDonough or reviewed his records, only James Parker, the vocational consultant chosen by Mr. McDonough's counsel in connection with this dispute, concluded that Mr. McDonough was physically disabled from performing the duties of his own occupation during the period in question.

Mr. McDonough's own neurologists, Drs. Duffis and Caplan, remarked following an August 18, 2009 visit that Mr. McDonough "has full strength, proximally and distally, in his upper and lower extremity on the left side; on the right side he has effort-dependent weakness in all muscle groups proximally and distally."  Dr. Caplan expressed his belief "that the symptoms are a complex reaction to [Mr. McDonough's] stressful work situation. [H]e cannot say no to excessive work and the present symptoms allow him to back off the responsibilities."  Following a September 15, 2009 follow-up visit, Drs. Duffis and Caplan noted only give-way (i.e. effort-dependent) weakness, and reaffirmed their view that Mr. McDonough did not suffer from any

neurological or physiological disorder.  Mr. McDonough's physical therapist, Catherine Sullivan noted that during his initial physical therapy session in April 2010, Mr. McDonough reported hip pain and tightness and was "very unsteady and unable to maintain static stance without grabbing onto the wall."  Yet while Mr. McDonough reported to Ms. Callahan that his hip pain and tightness had not improved as of the completion of his physical therapy on April 30, 2010, she noted that his mobility had improved and he had resumed light exercises at the gym. Finally, while the results of Mr. McDonough's FCE demonstrated diminished capacities in virtually every function tested, the evaluator concluded that Mr. McDonough was "performing in a sedentary level of physical demand with regard to load handling."[14]

Mr. McDonough's medical records pertaining to physical disability were reviewed by Aetna physicians Drs. Swotinsky and Rea, both of whom hold certifications in preventive and occupational medicine.  Contrary to Mr. McDonough's contention, Drs. Swotinsky and Rea do not appear to have inappropriately

---

[14] Mr. McDonough contends that this statement by Ms. Breeze should be taken to mean that he was performing at a sedentary level *only* with respect to load handling, and was completely disabled in all other respects.  I do not agree that Mr. Breeze's statement is properly susceptible to this interpretation, or more importantly, that Aetna abused its discretion in interpreting it differently.

focused on the lack of a definitive diagnosis instead of the impact of Mr. McDonough's demonstrated functional limitations on his ability to perform his own occupation.  They merely addressed the fact, as many of Mr. McDonough's treating providers had, that there is no physiological explanation for his symptoms.  Nor does it appear that either doctor relied on evidence "cherry-picked" from Mr. McDonough's medical records that supported a finding of no disability.  In ERISA benefit denial cases, "[i]t is the responsibility of the Administrator to weigh conflicting evidence." *Vlass*, 244 F.3d at 32.  Drs. Rea and Swotinsky made clear that they reviewed all medical records submitted by Mr. McDonough as part of his appeal, and both doctors specifically addressed much of the evidence that Mr. McDonough relies on in support of his position that he is physically disabled, or in the case of Dr. Swotinsky, explained why he declined to consider evidence from a particular source (James Parker).  Mr. McDonough therefore misplaces reliance on *Petrone*, in which I held that an administrator had abused its discretion by "simply ignor[ing] contrary evidence" and "engag[ing] only that evidence which supports his conclusion." *See Petrone*, 935 F.Supp.2d at 293.

   2.  Psychological Impairments

   Around the time that Dr. Northrup indicated that Mr. McDonough could return to work and Aetna notified him that his

benefits would likely be terminated following a vocational
review, Mr. McDonough informed Aetna that he had begun seeing
Mary Callahan and Dr. Stearns for mental health treatment.  It is
apparent from the administrative record that Mr. McDonough sought
mental health treatment for symptoms that, although perhaps
holistically related, do not appear to be a result of the
November 24, 2008 stroke-like episode that formed the basis of
his initial claim of disability.  If anything, the administrative
record suggests that Mr. McDonough's underlying mental health
issues brought about the stroke-like episode and accompanying
physical symptoms.

     The administrative record supports the inference that once
it became clear that Mr. McDonough had not suffered a stroke, he
shifted his efforts from supporting his disability claim based on
physical limitations resulting from the stroke-like episode, to
supporting his claim based on more generalized complaints of
anxiety and depression stemming from work-related stress.
Thereafter, Dr. Stearns indicated on a behavioral health
clinician form submitted to Aetna that Mr. McDonough reported
"sleep disturbance, heart palpitations, sweating, racing
thoughts, fear of death," and experienced panic attacks 4-5 times
per week with an average duration of two hours, and that as
result, Mr. McDonough was unable to work and likely would not be

able to return to work until October of 2010.  Dr. Giesen, on the
other hand, indicated that although he believed Mr. McDonough
would miss more than four days of work per month due to his
psychiatric condition, he was "unable to assess" Mr. McDonough's
ability to do "work-related activities on a day-to-day basis in a
regular work setting," and did not respond to a series of
questions aimed at evaluating this ability.  Later, Mary Callahan
opined in an October 5, 2010 report to Aetna that she did "not
believe that Mr. McDonough could perform the functions of his
occupation on a full time basis at [that] time" due to the
debilitating nature of his anxiety and associated symptoms,
including panic attacks brought on by "work memories, nightmares
and flashbacks."

    Mr. McDonough's mental health records were reviewed for
Aetna by Drs. Burstein and Dixit, as well as by Dr. Swotinsky as
part of his more comprehensive review.  Although both Drs.
Burstein and Dixit indicated that they had considered all mental
health records included in the administrative record, and noted
the opinions of Mary Callahan and Dr. Stearns that Mr.
McDonough's mental health condition prevented him from working,
they both also noted a lack of specific findings as to how any
specific impairments in psychological or cognitive functioning
prevented him from performing any specific work-related tasks

during the relevant time period.  For his part, Dr. Swotinksy
commented that Mr. McDonough's mental health records did not
suggest that Mr. McDonough suffered from a psychiatric disorder
severe enough to render him disabled, and that under "normative
date" projections, Mr. McDonough's actual diagnoses of
generalized anxiety disorder and adjustment order with depressed
mood would average only seven days out of work.

### 3.  Application of "Own Occupation" Standard

Mr. McDonough's principal objection to Aetna's final
determination, and to the medical reviews upon which the final
determination was based, is the contention that they failed to
evaluate his functional limitations properly against the duties
of his own occupation.  Mr. McDonough argues that Aetna
improperly measured his functional limitations against a generic
sedentary occupation standard, and takes particular issue with
Dr. Swotinsky's conclusion that because Mr. McDonough's job as a
systems analyst is sedentary in nature, "there are no jobs with
easier physical demands," and the "question is essentially
whether Mr. McDonough is completely disabled."  Mr. McDonough
also argues that Dr. Rea's own recommendation that "[a]ny
handling or fingering work with the right hand should be limited
to five-minute periods, alternating with 10-minute periods of
right hand rest," is incompatible with his position as a Systems

Analyst, which he contends requires him to spend significant amounts of time using a computer.  Mr. McDonough argues that his because the Plan calls for application of an "own occupation" standard, this aspect of Aetna's review necessarily constituted an abuse of discretion.

Mr. McDonough cites to *Miller* v. *American Airlines, Inc.*, 632 F.3d 837, 855 (3d Cir. 2011), for the sensible proposition that "it is essential that any rational decision to terminate benefits under an own occupation plan consider whether the claimant can actually perform the specific job requirements of a position."  The plaintiff in *Miller* was a commercial airline pilot, and the LTD plan at issue defined "disability" as "an illness or injury . . . which prevents a Member from continuing to act as an Active Pilot Employee in the Service of the Employer."  *Id.* at 842.  The *Miller* court held that the plan administrator had abused its discretion by, *inter alia*, relying on the "perfunctory" conclusion of a reviewing physician that the plaintiff "could perform as a pilot, without explaining how his claimed anxiety and latent risk of psychosis would be compatible with this uniquely stressful position."  *Id.* at 855.

In contrast to the facts of *Miller*, not only is Mr. McDonough not a commercial airline pilot, but the Plan at issue here expressly qualifies the definition of "own occupation,"

providing: "[y]our occupation will be viewed as it is normally performed in the national economy instead of how it is performed . . . for your specific employer; or at your location or work site; and without regard to your specific reporting relationship."  The Plan further defines "material duties" as the duties that "are normally required for the performance of your own occupation; and cannot be reasonably . . . omitted or modified."  Under this particular definition of "own occupation," therefore, the "material duties" of Mr. McDonough's "own occupation," may differ in some respects from the practical, day-to-day realities of his job at Biogen Idec.  In this case, there is no genuine dispute that the job of systems analyst is properly classified as "sedentary" as it is performed in the national economy; even Mr. McDonough's own vocational expert, James Parker, concluded as much.[15]  Nor is there any genuine dispute

---

[15] Mr. Parker further remarked that "although Mr. McDonough's occupation is defined as *sedentary*, considerable travel by plane was necessary in resolving project issues and coordinating client services.  The degree of walking required while in airports or in training of staff and customers would at times make this occupation *light* in terms of standing and walking." (emphases in original).  To the extent Mr. McDonough relies on this statement by Mr. Parker to argue that his was (at least occasionally) a light duty occupation, I am not persuaded.  The administrative record does not substantiate Mr. McDonough's claims regarding frequency of air travel, and even if frequent air travel were required in a manner that failed to accomodate Mr. McDonough's circumstances, there is no evidence that air travel is a material duty of the job as it is performed in the national economy.

that the administrative record contains ample evidence for Aetna to conclude that Mr. McDonough was capable of performing sedentary work, not the least of which was the opinion of his own primary care provider, Dr. Northrup.   Further, Mr. McDonough has not demonstrated that Dr. Rea's suggested restrictions on "handling or fingering work" cannot be accomodated in such a manner that would allow him to remain in his position.   For these reasons, Aetna did not abuse its discretion in its application of the own occupation standard to Mr. McDonough's disability claim.

* * *

Review for abuse of discretion is not an exact science. Ultimately, in determining whether an administrator abused its discretion or acted in an arbitrary and capricious manner, a court must "determine lawfulness by taking account of several different, often case-specific, factors, reaching a result by weighing all together." *Glenn*, 554 U.S. at 117.   Aetna's review of the administrative record in reaching its final determination was by no means perfect, nor would I necessarily have reached the same conclusion applying a *de novo* standard of review.   However, after reviewing the administrative record and the parties' submissions in the case, I am satisfied that Aetna did not act arbitrarily or capriciously in terminating Mr. McDonough's LTD benefits.   Rather, it made an informed judgment that Mr.

-45-

McDonough's various medical problems, while certainly worthy of sympathy, did not render him disabled under the terms of the Plan. *See Boardman*, 337 F.3d at 12, 16 (affirming termination of LTD benefits for claimant who suffered from a variety of "diffuse symptoms," the legitimacy of which were not disputed, but whose medical records supported plan administrator's conclusion that her "physical abilities are not so diminished as to prevent her from performing the duties of her own or any other similar occupation").

**B.  *Other Issues***

> **1.  Claim for Statutory Penalties For Failure to Provide Requested Plan Documents**

Mr. McDonough seeks a penalty pursuant to 29 U.S.C. § 1132(A) of $110 per day for each day the Group Contract was not provided to him, beginning thirty days after his initial written request on December 5, 2009 and ending on February 4, 2013, when Aetna finally produced the Group Contract.  In total, he requests the sum of $115,700, which equals $110 per day for 1,157 days. Aetna opposes the request, relying almost exclusively on the Second Circuit's statement in *Thurber* that "[a]lthough plan participants are entitled to receive copies of the [summary plan description], pursuant to 29 U.S.C. §§ 1021, 1022, and 1024, the administrator of an ERISA plan has no obligation to ensure that

participants receive copies of the plan itself." *Thurber*, 712 F.3d at 659.

As discussed above, *see supra* Part II.A, the Second Circuit in *Thurber* addressed a situation where a claimant fought for application of *de novo* review to her appeal on the basis that the plan administrator never provided her with a copy of the plan document containing the reservation of discretionary authority. *Id.* at 658. In contrast to the present case, however, there is no suggestion that the plaintiff in *Thurber* ever *requested* a copy of all plan documents. *See id.* As Mr. McDonough correctly asserts, 29 U.S.C. § 1024(b)(4) provides that an ERISA plan "administrator *shall, upon written request* of any participant or beneficiary, furnish a copy of the latest updated summary, plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, *contract, or other instruments under which the plan is established or operated.*" *Id.* (emphases added); *see Doe* v. *Travelers Ins. Co.*, 167 F.3d 53, 59 (1st Cir. 1999). In turn, 29 U.S.C. § 1132(c) requires that "any plan administrator must furnish, upon request and within 30 days, 'any information which such administrator is required by [ERISA] to furnish to a participant or beneficiary . . . ,'" *Doe*, 167 F.3d at 59 (quoting 29 U.S.C § 1132(c)(1)(B)), and entitles

the participant or beneficiary to a penalty of up to $110 per day,[16] at the discretion of the court.

There is no allegation that Aetna acted in bad faith in failing to provide the Group Contract upon request; rather the problem appears to be inattentiveness to its duties of disclosure upon request. Neither the statute nor the case law provides much guidance regarding the appropriate penalty. Mr. McDonough's request for the maximum allowable penalty of $115,700 is plainly disproportionate on the facts of this case. Mr. McDonough acknowledges, as the Second Circuit observed in *Thurber*, 712 F.3d at 660, that a claimant ordinarily does not suffer substantial prejudice by the belated disclosure of the Group Contract. However, while the prejudicial effect of the belated disclosure of a reservation of discretion is minimized by the fact that such a provision is directed principally at a reviewing court, *see id.*, I observe that whether a particular plan contains a discretionary reservation may well impact, among other things, a claimant's ability to find counsel willing to take his case and the litigation strategy to be pursued. Moreover, 29 U.S.C. § 1024(b)(4) explicitly provides that an ERISA plan participant is entitled to certain information upon request, and Aetna plainly

---

[16] Although the statute itself provides for a maximum penalty of $100 per day, that maximum was increased to $110 per day by 29 C.F.R. § 2575.502c-1.

-48-

failed to comply with that requirement here.  It should not be permitted to do so with inattentive impunity.  A penalty is necessary to capture Aetna's attention to its statutory obligations.  Accordingly, I will assess a penalty of $5,000.00 pursuant to my discretion under 29 U.S.C. § 1132(A).  If this penalty does not prove to be a sufficient encouragement to plan administrators like Aetna to comply with their statutory responsibilities going forward, future litigation can recalibrate the dollar level of such penalties.

### 2.  Liability of Biogen Idec and the Plan itself

Aetna argues that as the "party that controls administration of the plan," it is the only proper defendant to this action. *See Terry* v. *Bayer Corp.*, 145 F.3d 28, 35-36 (1st Cir. 1998) (noting that it is the decision of the "entity with the power to make, and . . . the entity that actually made, the final decision to terminate [the plaintiff's] benefits" that is subject to review).  I agree.  In any event, although Mr. McDonough has named Biogen Idec, Inc., and the Biogen Idec, Inc. Group Long Term Disability Plan as defendants, he concedes that Aetna is the real party in interest and may properly be the sole party chargeable for the statutory penalty.

### IV.  CONCLUSION

For the reasons explained above, Aetna's Motion for Summary Judgment is GRANTED.  Mr. McDonough's Motion for Summary Judgment is DENIED, except insofar as I assess a statutory penalty pursuant to 29 U.S.C. § 1132(A) against Aetna in the amount of $5,000.00.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT